UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:04cv-102-R

EDWARD R. KNOUS and
JANET KNOUS                                                                                  PLAINTIFFS

v.

CONAGRA FOODS, INC.                                                                     DEFENDANT

## MEMORANDUM OPINION

This matter comes before the Court on the Defendant's Motion to Exclude the Plaintiffs' Expert Witnesses (Docket #94). The Plaintiffs, Edward and Janet Knous ("Knous's") have responded to this motion (Docket #98), and the Defendant, ConAgra Foods, Inc. ("ConAgra") has replied to that response (Docket #104). This matter is now ripe for adjudication. For the following reasons, the Defendant's motion to exclude is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises out of an injury sustained by Plaintiff Edward Knous ("Knous"), a truck driver, when he fell out of the truck he was driving while stopped at a weigh station in Lyon County, Kentucky. At the time, the truck contained frozen chicken from ConAgra's plant, which Mr. Knous was transporting. The tractor-trailer he was driving was owned by Henderson Trucking ("Henderson")n who is not a party in this case. His employment with Henderson was structured as a leased employee arrangement between Staffing Concepts and Henderson. Mr. Knous brought suit against ConAgra seeking compensation for injuries arising out of this incident under the theory that ConAgra negligently exposed him to carbon dioxide, which caused his fall from the truck and his resulting paralysis. (Docket # 2).

## STANDARD

The admissibility of expert witness testimony is governed by FED. R. EVID. 104(a) and 702, applied under the rubric established in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Rules require that the Court ensure that any and all expert testimony or evidence "is not only relevant, but reliable." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir. 2001) (*quoting Daubert*, 509 U.S. at 589). The Court must determine[1] whether the expert:

> is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Nelson*, 243 F.3d at 251 (*quoting Daubert*, 509 U.S. at 592-93). Testimony is "scientific" when "an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *Kumho Tire*, 526 U.S. at 152. The proposed testimony must be relevant, in that there must be a "valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 149 (*quoting Daubert*, 509 U.S. at 592). In other words, there must be a "fit" between the proposed testimony and the question(s) presented by the case at bar. *Daubert*, 509 U.S. at 591.

*Daubert* outlined four factors under which to evaluate proffered expert testimony to ensure its reliability: "testing; peer review and publication; potential rate of error, and general acceptance in the relevant community." *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir.

---

[1] A "district court is not required to hold an actual hearing" to make this determination. *Nelson*, 243 F.3d at 249.

2000). However, these factors are "neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case." *Nelson*, 243 F.3d at 251. The Court "must consider whether the factors are reasonable measures of reliability in a given case" before evaluating proffered expert testimony. *Id.* (citing *Kumho Tire*, 526 U.S. at 152). The proponent of the testimony "must establish its admissibility by a preponderance of proof." *Id.*

FED. R. EVID. 702 was recently amended to comport with *Daubert* by including the following language: "if (1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Advisory Committee Notes to this amendment "explain that no specific factors were articulated in the new rule because the factors mentioned in *Daubert* are neither exclusive, nor dispositive, and do not apply to every type of expert testimony." *Nelson*, 243 F.3d at 250 n.4. The Advisory Committee Notes do offer the following five factors as "relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact":

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
> (3) Whether the expert has adequately accounted for alternative explanations;
> (4) Whether the expert is being careful as he would be in his regular professional work outside his paid litigation consulting; and
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*See* Advisory Committee Notes, FED. R. EVID. 702 (2000 Amendments) (citations omitted). The

Notes echo the requirement of flexibility outlined in *Kumho Tire*,[2] and indicate that "other factors may also be relevant" and "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Finally, the fact that the Court finds a particular expert is offering reliable testimony "does not necessarily mean that contradictory expert testimony is unreliable." FED. R. EVID. 702 Advisory Committee Notes. It is ultimately for the jury to decide, based on expert testimony the Court finds to be reliable (as well as lay testimony), which version of events is "correct." *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("[T]he evidentiary requirement of reliability is lower than the merits standard of correctness."); *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

## DISCUSSION

The Defendant opposes the admission of four (4) of the Plaintiffs' expert witnesses, asserting that these witnesses fail the *Daubert* standard. The proposed expert witnesses include: Dr. James Metcalf ("Dr. Metcalf") (as to causation); Dr. Robert Meriwether ("Dr. Meriwether") (as to causation); Dr. Henry Holtzman ("Dr. Holtzman") (as to causation); and Roland Brown ("Mr. Brown") (as to industry standards). The Court will address the admissibility of each of these expert witnesses under *Daubert* and FED. R. EVID. 104(a) and 702 individually.

### 1. Dr. Metcalf

The Defendant objects to the admission of the opinions of Dr. Metcalf as to causation, arguing that his opinions do not meet the *Daubert* standard because Dr. Metcalf did not establish

---

[2] "[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

the "dose" before determining causation; Dr. Metcalf employed "backwards reasoning" when making his conclusions as to causation; and that Dr. Metcalf's opinion triggers "red flags" under *Daubert*. Dr. Metcalf opines that the Plaintiff's exposure to carbon dioxide ("CO2") from dry ice in the truck caused a "vasovagal reaction," which amounts to "faintness and loss of consciousness due to reflex reduction in blood pressure." Dr. Metcalf argues that this condition led to Knous falling from the bed of his truck to the ground, resulting in paralysis. The Defendant does not challenge the credentials of Dr. Metcalf, but instead argues that his opinions are not admissible under *Daubert*.

The Defendant refers the Court to the unpublished Sixth Circuit Court of Appeals decision in *Downs v. Perstorp Components, Inc.*, 26 Fed. Appx. 472 (6th Cir. 2002). In *Downs*, the Court reviewed a decision by the district court to deny the admission of testimony of the plaintiff's expert witness about causation regarding a chemical known as "Rubiflex." *Downs*, 26 Fed. Appx. at 473. In looking at the admission of expert testimony from the plaintiff's treating physician, the magistrate judge excluded the testimony holding that the opinions and conclusions were not based on valid scientific methodology. *Id.* at 475. The magistrate judge highlighted that at the time the expert witness diagnosed the plaintiff, he was not aware of the components of Rubiflex, nor did he know the amount of Rubiflex in which the plaintiff had been exposed. *Id.* Further, the magistrate judge noted that the expert witness had found no scientific literature suggesting that Rubiflex could cause neurological problems and that he had not conducted any test as to the potential effects of Rubiflex exposure. *Id.*

The Court in *Downs* stressed "[t]he most obvious problem with Dr. Kilburn's methodology is that he never identified the component or components in Rubiflex that were

responsible for Downs' condition...Dr. Kilburn admitted that he could not identify which components of Rubiflex caused the various neurological problems that he diagnosed Downs as having." *Id.* at 475-76.  In addition, the Court stated that another "significant" flaw in the expert testimony was that the expert "made no attempt to either determine the dose to which Downs was exposed or to identify independently what dose of Rubiflex, or the toxins he had identified in Rubiflex, is necessary to cause the conditions that he observed in Downs." *Id.* at 476.  The Court also determined that the expert's methodology involved "reasoning backwards from Downs' condition, and, through a process of elimination." *Id.*  The Court ultimately held that because the expert was unaware of the components of Rubiflex when he made his conclusion and because he never attempted to test or prove his hypothesis, the method employed by the expert did not meet the requirements of *Daubert*, and therefore, the magistrate judge rightfully excluded the testimony. *Id.*

    The instant matter can be distinguished from *Downs* on several grounds.  First, the substance in this case is not a complicated and uncommon toxin as Rubiflex was in *Downs*.  $CO_2$ is a common substance that many physicians are familiar with as far as its components as well as its effects on the human body.  Second, in contrast to *Downs*, Dr. Metcalf identified the components of $CO_2$ as well its effects on the vagus nerves of the Plaintiff.  In his deposition, Dr. Metcalf noted that when $CO_2$ within the human body is "mildly elevated," it can result in somebody passing out.  This differs from *Downs*, where the expert in that matter did not know the components of Rubiflex before he made his conclusions.

    In addition, the level of dosage in this case, unlike *Downs*, was not dispositive in Dr. Metcalf's theory of causation.  Dr. Metcalf stated that he based his opinion not on the level of

CO2 in truck, but instead on the "rate of change" of the level of CO2 within Knous' blood that caused Knous to become unconscious. The Defendant notes that the level of CO2 in the truck was over 3.0% (or 30,000 ppm), with a margin of error of 50%-100%. Dr. Metcalf researched this level and the potential changes it could have on humans by requesting a "Material Safety Data Sheet" ("MSDS") prepared by the United States Occupational and Health Safety Administration ("OHSA"). The MSDS report stated that at a concentration effect of CO2 at 3% causes breathing to increase to twice the normal rate, as well as headaches, and an increase in blood pressure and pulse rate. The MSDS report also notes that inhalation at concentrations between 2%-10% of CO2 can cause: nausea, dizziness, headaches, mental confusion, and an increase in blood pressure and respiratory rate. In reaching his conclusion, Dr. Metcalf stated:

> I want to make it clear I don't think the absolute value of the CO2 was that important as it was the physiological effect that all of this had on him, which started out as a protracted nausea, dehydration, leading up to ultimately a syncope [fainting] and his falling and injuring his spine.

In comparison to *Downs*, where the Court found that the specific dosage was needed because of the direct contact of Rubiflex on the skin of the plaintiff, here, the specific dosage is not needed to support the opinion of Dr. Metcalf because his conclusion is supported by the minimum range provided by the Defendant. In addition, the fact that the exposure to CO2 did not directly cause the injury, as was the case in *Downs*, demonstrates that its level was not as pertinent in determining the actual injury in this matter.

In further contrast *Downs*, Dr. Metcalf does not employ backwards reasoning in reaching his conclusion. In *Downs*, the expert stated "[w]e know we had an effect, we know that Rubiflex was there, we've excluded all other possibilities...I see nothing else is needed." *Downs* at 476. Here, Dr. Metcalf explains a serious of physiological reactions to the CO2 exposure that he

believes led to the syncope.  He states that Knous became exposed to the CO2 in the truck that came from the dry ice used to transport the produce, and he inhaled it when he opened the hatch to examine the contents.  After his exposure to the CO2, Dr. Metcalf states that Knous became nauseated for a few minutes because of the level of exposure, but then got himself together, and got on the road again.  Dr. Metcalf then states that over an hour after the exposure Knous became nauseated again, pulled over the truck, and began to dry heave.  Dr. Metcalf then states that as he stood up and opened the door, he passed out and fell, causing the injury.  This demonstrates that unlike the expert in *Downs*, the Dr. Metcalf did not use backwards reasoning when making his causation opinion.  Accordingly, as applied to this matter, the holding in *Downs* does not preclude the opinion of Dr. Metcalf as to causation because dosage is not dispositive as it was in *Downs*, and Dr. Metcalf did not employ backwards reasoning.

   Lastly, the Court must determine whether Dr. Metcalf's causation opinions raises "red-flags" under *Daubert*.  The Defendant argues that Dr. Metcalf: 1) did not use a widely accepted technique in the relevant scientific community; 2) Dr. Metcalf relied too much on anecdotal evidence; 3) Dr. Metcalf relied on temporal proximity; 4) Dr. Metcalf was not "fit" to offer an opinion in this matter; 5) Dr. Metcalf failed to consider other possible causes; and 6) lastly, Dr. Metcalf improperly relied on the MSDS without establishing the dosage or performing a cause-effect relationship.

   In looking at the first reg flag, Dr. Metcalf never stated that his technique was not widely accepted.  In addition, the Defendant has not provided evidence as to what would be the widely accepted test in this matter.  The Defendant attempts to use statements from Dr. Metcalf out of context to demonstrate that his technique is not widely accepted; however, his statements, even

taken out of context, do not lead to that conclusion.

In examining the second red flag, the Defendant asserts that Dr. Metcalf does not know a lot about dry ice, and therefore, does not have enough background to give an opinion. The Defendant confuses the difference between dry ice and $CO_2$. Dr. Metcalf stated that the $CO_2$ level in the truck came from the presence of dry ice. The Defendant does not dispute this. Further, unlike the matter in *Downs*, $CO_2$ is not a rare substance, and its composition and effects on humans are widely known throughout the medical field. As such, Dr. Metcalf had a proper background to render an opinion on this matter.

The third red flag argued by the Defendant is temporal proximity. The Defendant argues that Dr. Metcalf improperly based his opinion on the closeness of the relationship in time between Knous' exposure to $CO_2$ and the fall, calling it flawed logic of *post hoc ergo propter hoc*. To support this argument, the Defendant cites the Seventh Circuit Court of Appeals case of *Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 614, 616 (7th Cir. 1993). However, in *Porter*, the substance in question was ibuprofen not $CO_2$, and the Court reasoned that the plaintiff's expert did not have all of the facts needed to reach his conclusion, and therefore, he had improperly relied on temporal proximity. *Porter* at 616. Here, Dr. Metcalf had all the necessary facts to make his determination. As such, *Porter* does not support the Defendant's contention.

Another case cited by the Defendant, *Schmaltz v. Norfolk & Western Ry.*, is also distinguishable from the instant matter, as the Court in that case dealt with an herbicide, not $CO_2$, and the Court held that the expert could not rely on temporal proximity because he lacked knowledge of the nature and structure of the herbicide in question. *Schmaltz v. Norfolk &*

*Western Ry.*, 878 F. Supp. 2d 1119, 1122 (N.D. Ill. 1995). Here, unlike *Schmaltz*, Dr. Metcalf knew enough about CO2 to make a conclusion and relate it to the sequence of time in which the events took place. In addition, the remaining cases cited by the Defendant in support of this argument do not apply to the instant matter because the substance involved was not CO2, but was instead a more complex substance, and Dr. Metcalf did not rely solely on the sequence of events in making his determination. The Court also notes that it determined *supra* that Dr. Metcalf did not use backwards reasoning in reaching his opinion. Accordingly, Dr. Metcalf did not improperly rely on temporal proximity in reaching his conclusion.

The fourth red flag asserted by the Defendant is that he had insufficient information about the case to render an opinion because he did not know all of the facts at the time and he did not examine Knous until well after the accident. However, Dr. Metcalf has stated despite any misunderstandings he may have initially had about the facts, he would still come to the same conclusions regarding the effects of CO2 on Knous. He provided a basis for these opinions when he was deposed by the parties. As such, Dr. Metcalf was fit to give his opinion on this matter.

In looking at the fifth reg flag, the Defendant contends that Dr. Metcalf failed to consider other possible causes for Knous' fall. ConAgra argues that Dr. Metcalf should have considered: Knous' blood pressure medication; the presence of methamphetamine in his person; the smell of dead chicken; and a pre-existing ankle injury may have contributed to the cause of the fall. The Court recognizes that Dr. Metcalf may not have considered other causes of the accident in reaching his conclusion, including the conditions proposed by the Defendant. However, that alone does not warrant the exclusion of his testimony. *Claar v. Burlington Northern R. Co.*, 29

F.3d 499, 502 (9th Cir. 1994).

As provided by the Defendant, in *Claar*, the Court held that the experts' testimonies could not come in because they had not offered the reasoning and methods used to reach their conclusions. *Claar* at 502. The Ninth Circuit Court of Appeals also noted that the decision to exclude their testimonies were supported by the fact that under the circumstances they had also failed to consider other causes of the injury. *Id.* This fact was relevant because the experts "fail[ed] to discuss the majority of the medical conditions alleged by plaintiffs." *Id.* Here, unlike *Claar*, Dr. Metcalf discussed the majority of ailments described by the Plaintiff when reaching his medical conclusion, and accurately attributed all of those to the exposure to $CO_2$. Whereas the Defendant attempts to piece together all of the ailments of the Defendant on the day of the accident based on speculation, Dr. Metcalf substantiates his findings by explaining a series of physiological reactions based on Knous' $CO_2$ exposure. Accordingly, the circumstances in this matter do not warrant the exclusion of Dr. Metcalf's testimony.

Lastly, the Defendant asserts that Dr. Metcalf improperly relied on the MSDS report without establishing the dose or performing a cause-and-effect test. The Defendant cites a 1991 case from the United States District Court for the Southern District of Mississippi in support of this contention. *Bailiff v. Manville Forest Products Corp.*, 772 F.Supp. 1578, 1581-82 (S.D. Miss 1991). In *Bailiff*, in contrast to the instant matter, the substance in that case involved "various chemicals and dust" and their relation to the breathing conditions of the plaintiff. *Id.* at 1579. The Court in *Bailiff* held that the MSDS sheet was improperly used by the expert in reaching his conclusion as to the cause because "the compilation of MSDS claimed to have been reviewed by Dr. Allum is not comprehensive as it does not include any information concerning a number of

other chemicals and dusts to which Mr. Bailiff testified he was exposed." *Id.* 1581-82. Here, in contrast to *Bailiff*, the only substance in question is CO2. As such, the reasoning in *Bailiff* does not apply to the instant matter.

As determined *supra*, the dose was not dispositive in reaching the conclusions made by Dr. Metcalf in his opinion. Accordingly, Dr. Metcalf properly relied upon the MSDS report in rendering his opinion in this matter.

In looking at the entirety of the Defendant's argument under *Daubert* as well as the methodology and opinions stated by Dr. Metcalf, the Court finds that Dr. Metcalf's opinion as to causation meets the *Daubert* standard, and shall be admitted under FED. R. EVID. 104(a) and 702.

### 2. Dr. Meriwether

The Defendant contends that Dr. Meriwether's opinion regarding causation does not meet the *Daubert* standard. Dr. Meriwether was Knous' treating neurosurgeon who was identified by the Plaintiff to provide testimony regarding Knous' future medical needs; however, he also offered a causation opinion. The Defendant essentially asserts the same arguments it used to challenge the opinion of Dr. Metcalf. However, in contrast to Dr. Metcalf, Dr. Meriwether did not use scientific reasoning or methodology through a series of physiological reactions to reach his conclusions about Knous' exposure to CO2. There is no evidence that Dr. Meriwether referred to any research or ran any tests as Dr. Metcalf did before reaching his conclusion. When asked about how he reached his conclusion, Dr. Meriwether stated:

> A person that is exposed to something like a toxic effect like this and two hours later tells me they're throwing up - my dad had an old saying, *"When you hear a hoof beat, you look for horses, not zebras." And that sounds like a horse. And it sounds like you were exposed to a toxic substance that's still having some effect, but not necessarily the cerebral effect that you'd expect with fainting and things like that.* I don't think anybody really knows for sure. I don't think there's anybody that can

12

> tell you for sure what kind of effects it's had on the system as a whole in two hours. (emphasis added).

This reasoning offered by Dr. Meriwether demonstrates the backwards reasoning addressed by the Sixth Circuit in *Downs*. 26 Fed. Appx. at 476. Though Dr. Meriwether may have some general knowledge as to the effects of CO2, he has not demonstrated a scientifically reliable method to prove his conclusions as to causation in this particular matter.

This is not a criticism of Dr. Meriwether's qualifications. He is well qualified in his field of study. He is a board certified neurosurgeon with considerable experience. It appears he was not requested, prior to his deposition, to make an expert analysis on causation. This is supported by the fact that he was not listed as a causation expert prior to his deposition. While Dr. Meriwether's analysis has a common sense approach to it, it does not pass a *Daubert* analysis. However, it is evident that Dr. Meriwether was never requested to conduct such an analysis or research. Accordingly, Dr. Meriwether's opinion as to causation does not meet the *Daubert* standard, and therefore, shall be excluded.

### 3. Dr. Holtzman

The Plaintiffs retained Dr. Holtzman as their causation expert. Dr. Holtzman is a retired respiratory and pulmonary specialist from Philadelphia. Dr. Holtzman stated in his deposition that a person such as Knous could suffer from the onset of symptoms from CO2 exposure similar to those complained of by Knous before he fell. The Defendant contends that his opinions regarding causation should be excluded because he did not establish the dose and he made faulty factual assumptions in reaching his conclusions.

In regards to the dose argument asserted by the Defendant, the Court has already addressed this matter, *supra*, holding that in the instant matter, the dose is not dispositive

because of the substance involved and its indirect relationship to the injury, as well as the fact that the Defendant submits that there was at least a 3% level in the truck. However, the faulty factual assumptions claim requires a closer look by the Court. The Defendant cites the Sixth Circuit Court of Appeals case of *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989) in support of its argument.

In *Shahid*, a §1983 case, the Court excluded the expert testimony of the plaintiff's witness regarding the negligence of the defendant because the Court determined that it would prejudicially confuse the jury to hear a witness base his opinions on ultimate issues of fact that were for the jury to determine. *Shahid*, 889 F.2d at 1547. This exclusion was bolstered by the fact that the expert witness gave his testimony over a videotape, and therefore, counsel could not amend his factual assertions. *Id.* The Court further held that the expert had made a legal conclusion as to the negligence of the defendant, which supported the exclusion of his testimony. *Id.* at 1547-48.

In the instant matter, in contrast to *Shahid*, Dr. Holtzman does not attempt to make any factual conclusions that should be left for the jury decide. In addition, his testimony would be in person, and he does not make any legal conclusions. Instead, Dr. Holtzman explains the symptoms that can come from an exposure to $CO_2$. Though his initial report contained some factual misunderstandings, these were cleared up at his deposition, where he said despite his misunderstandings as to the timing and when and where Knous became exposed to the $CO_2$, his opinion did not change. Dr. Holtzman essentially states that the effects of $CO_2$ can be both short term and long term, which the Defendant may challenge; however, Dr. Holtzman did not rely on a misunderstanding of the facts when reaching this conclusion. As stated by the Sixth Circuit

Court of Appeals in *United States v. L.E. Cooke Co.*, "where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis...any weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility."*United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). Accordingly, Dr. Holtzman's opinion as to causation meets the *Daubert* standard, and shall be admitted under FED. R. EVID. 104(a) and 702.

### 4. Mr. Brown

The Plaintiffs have retained Roland Brown to offer testimony on the industry standard within the trucking business regarding the use of warning stickers on bills of lading if dry ice was onboard and padlocks on trailers if dry ice was in the load. Mr. Brown has worked in the trucking business for most of his life, beginning in the 1960's, and has remained active in the business as an expert witness for more than ten (10) years though his consulting firm. Most of his work experience took place in Alabama, including several stints as a safety inspector for a trucking companies.

From his work experience, he stated that there are several routine safety steps that carriers and shippers use to avoid dangerous exposure to $CO_2$ as a result of dry ice, including the use of warning stickers on bills of lading. Further, Mr. Brown states that padlocks are routinely used for safety trucks that are loaded with frozen food. He stated that these padlocks are put on after the truck is loaded, and are removed by the security guard once the truck reaches the gate. Mr. Brown also noted that in dealing with dry ice on numerous occasions while working in the business, there would be labels about the hazards of handling it as well as breathing it for an

extended period of time. In addition, at his trucking company he recalled that he would train his drivers on how to handle dry ice, and that these safety lessons resulted from one of his drivers becoming ill after exposure to dry ice.

Mr. Brown bases his opinions on his experience, noting that companies who he has worked with have transported frozen poultry products with warning stickers and padlocks. He named at least four (4) companies who he worked worth who used warning labels and/or padlocks. Mr. Brown stated that in his experience in dealing with transportation safety, ant shipper should warn any carrier about any potential danger involved with the transportation of a load. He states that this includes using a warning label and/or padlock because it was the standard within both the trucking and poultry industry. The Court will address each of these safety measures separately.

### *Warning Labels*

The Defendant contends that Mr. Brown personally never gave warnings about dry ice when he worked in the trucking industry. Additionally, the Defendant contends that Mr. Brown has an insufficient basis to testify about warning stickers because he bases his opinion on three (3) companies that he has dealt with in the past, and therefore, he cannot speak to the industry standard. ConAgra further argues that Mr. Brown has neither provided nor referred to any studies, reports or policies that require that warning labels be placed on bills of lading.

In support of its argument, the Defendant refers the Court to the Sixth Circuit Court of Appeals case of *Patterson v. Cent. Mills, Inc.*, 64 Fed. Appx. 457 (6th Cir. 2003) and the Kentucky Supreme Court case of *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 583 (Ky. 2000). In *Patterson*, a young boy suffered burns when a t-shirt he was wearing caught

16

fire during a kitchen accident. *Patterson* at 460. The child and his mother brought a products liability action against the company, and offered the testimony of an expert to talk about warning labels on clothing. *Id.* at 462. The district court excluded the expert's testimony in that matter, and the Sixth Circuit affirmed that decision, stating that the expert:

> had never written flammability warnings for clothing, had no specific education on warnings, had no specific training with respect to warnings on clothing, and had never had an article regarding clothing subjected to peer review. Indeed, Damant's only experience with flammability warnings came with regard to those placed on mattresses and furniture.

*Id.*

Here, in contrast to *Patterson*, Mr. Brown has had experience working with warning labels in the poultry and trucking business through his employment. The expert in *Patterson* dealt with warning labels in a completely different enterprise than the subject matter of the instant case. By virtue of his experience in the trucking and poultry business, Mr. Brown offers his opinion as to warning labels he has dealt with during his work tenure. As stated in *Daubert*, courts may take into account an expert's knowledge, *experience*, education, training and peer review when conducting their gatekeeping role under FED. R. EVID. 104(a) and 702. *Daubert*, 509 U.S. at 589, 593.

In *Thompson*, an automobile employee was injured while changing a tire rim manufactured by Goodyear. *Thompson* at 576. The plaintiff sought to bring in an expert to testify about Goodyear's liability for negligent design and failure to warn. *Id.* The trial judge excluded his testimony concerning Goodyear's alleged failure to warn because the only industry standard offered by the plaintiff was the OHSA standard, and the expert agreed that Goodyear had abided by that standard. *Id.* at 582. The Court further held that the expert offered no

17

"industry involvement" in as far as stating what companies used the method of warning suggested by the expert. *Id.*

In the instant matter, unlike the expert in *Thompson*, Mr. Brown offers industry involvement through his personal experience in interacting with companies in the trucking business who used warning labels when transporting poultry and other products stored in dry ice. Further, Mr. Brown has not stated that he believes that ConAgra abided by any industry standard regarding the warning label as did the expert in *Thompson*. Lastly, the expert in *Thompson* was brought in to give his opinion concerning whether or not Goodyear had provided an inadequate warning, whereas Mr. Brown has given his opinion as to the industry standard. Mr. Brown will not make any legal conclusions through his opinion, but instead will offer what he believes is the industry standard regarding warning labels through his experience.

In *Walker v. Jax Mold & Mach. Ltd.*, the Sixth Circuit Court of Appeals held that the district properly allowed to expert witnesses to offer opinions concerning industry standards based on their practical experience in bladder mold manufacturing. *Walker v. Jax Mold & Mach. Ltd.*, 72 F.3d 131 (6th Cir. 1995). The Court stated:

> [t]he district court permitted [the experts] to testify as experts on industry standards with respect not only to design and manufacture, but also as to labeling, warning or instructions. Due to their extensive practical experience in the relevant industry, the district court did not err in finding that Casto and Thornton were qualified to provide information on industry standards, nor did the court abuse its discretion in determining that their expert opinions would assist the jury.

*Id.*  Similar to the experts in *Walker*, Mr. Brown's experience in dealing with trucking safety issues as well as his dealings with warning labels permit him to offer his opinions on the industry standard in this matter. Accordingly, Mr. Brown has a sufficient basis to testify about warning labels.

*Padlocks*

The Defendant contends that Mr. Brown has an insufficient basis to testify about padlocks on trucks because he has very little experience dealing with padlocks. ConAgra claims that the Defendant had merely heard about the use of padlocks from one company, but did not have firsthand experience with them. However, in his deposition, Mr. Brown stated,

> In my work experience, I have transported - or the companies whom I have worked transported frozen poultry products from two or three different poultry plants. And during my experience, I have actually had drivers to say that particular plants had padlocks on the trailers of they were dropped in the yard, or padlocks would be put on the trailers by the shipping personnel after they were load and then removed before they left the facility.

In addition, Mr. Brown was able to reference plants that he had done business with where drivers had padlocks on their trucks that had to be removed before the drivers could leave the plant, including two (2) in Alabama. Mr. Brown also states that in his many years working he had contact with numerous driver who had spoken to him about the use of padlocks. His knowledge and experience in this area meet the *Daubert* requirements. The reasoning used by the Sixth Circuit Court of Appeals in *Walker*, applied to warning labels, also applies to his opinion regarding padlocks. *See Walker*, 72 F.3d at *1. Accordingly, Mr. Brown may offer his opinion as to the use of padlocks in the trucking industry.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Exclude is **GRANTED in part** and **DENIED in part**. Drs. Metcalf and Holtzman may testify as to causation in this matter regarding Mr. Knous' exposure to carbon dioxide. Dr. Meriwether may not offer his opinion as to causation in this matter regarding Mr. Knous' exposure to carbon dioxide. Lastly, Mr. Brown may offer his opinions, based on his experience, as to the industry standard concerning warning

labels and padlocks used in the trucking and poultry industry when shipping goods in dry ice.

An appropriate order shall issue.